UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────X
STATE NATIONAL INSURANCE COMPANY,

          Plaintiff,

-against-

SCOTTSDALE INSURANCE COMPANY and
JAMES RIVER INSURANCE COMPANY,

          Defendants.
───────────────────────────────────────X

Civil Action No. 1:25-cv-3506

**COMPLAINT FOR**
**DECLARATORY JUDGMENT**

Plaintiff, STATE NATIONAL INSURANCE COMPANY ("SNIC" or "Plaintiff"), by way of Complaint for Declaratory Judgment and for Damages against Defendants, SCOTTSDALE INSURANCE COMPANY ("Scottsdale") and JAMES RIVER INSURANCE COMPANY ("James River"), (collectively, "Defendants"), alleges as follows:

1. Plaintiff brings this action seeking a declaratory judgment that Defendants are obligated to provide defense and indemnity coverage on a primary and noncontributory basis to WC 28 Realty LLC ("WC 28") and Pizzarotti IBC LLC ("Pizzarotti") as additional insureds for the lawsuit entitled *Jewels Moore v. WC 28 Realty LLC and Pizzarotti IBC LLC*, Index No. 30809/2017E, pending in the Supreme Court, Bronx County (the "Underlying Moore Lawsuit"), that Defendants must reimburse Plaintiff for the fees and costs incurred for the defense of WC 28 and Pizzarotti in the Underlying Moore Lawsuit.

**THE PARTIES**

2. Plaintiff is an insurance company incorporated in the State of Texas, with its principal place of business located in Texas.

3. Plaintiff is authorized to, and does transact, the business of insurance in the State of New York.

1

4. Based on information and belief, Defendant Scottsdale is an insurance company organized under the laws of Ohio, with its principal place of business located in Arizona.

5. Based on information and belief, Scottsdale is authorized to, and does transact, the business of insurance in the State of New York.

6. Based on information and belief, Defendant James River is an insurance company organized under the laws of Ohio, with its principal place of business located in Virginia.

7. Based on information and belief, James River is authorized to, and does transact, the business of insurance in the State of New York.

## JURISDICTION AND VENUE

8. This dispute is between citizens of different States, regarding an amount in controversy exceeding the value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs. Diversity jurisdiction therefore is proper pursuant to 28 U.S.C. §1332.

9. In his Verified Bill of Particulars and Supplemental Bills of Particulars, the Underlying Plaintiff, Jewels Moore, alleges that he sustained permanent injuries to both shoulders, both knees, cervical and lumbar spine, with surgery on the cervical spine, lumbar spine and right knee, and seeks recovery for past lost earnings of approximately $45,000.000 and special damages related to medical expenses of approximately $48,000.000.

10. Venue is proper under 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions giving rise to this dispute occurred in this judicial district.

11. This is a case or controversy involving insurance policies that were either issued in this judicial district or had covered risks in this judicial district, thereby permitting declaratory judgment under 28 U.S.C. § 2201.

## THE UNDERLYING ACTION

12. On or about November 13, 2017, Jewels Moore commenced an action in the Supreme Court, Bronx County against WC 28 and Pizzarotti seeking recovery for personal injuries allegedly sustained on January 17, 2017 while working at the premises located at 527 West 27th Street, New York, NY (the "Premises") when he was caused to fall.  A true and accurate copy of the Complaint in the Underlying Moore Lawsuit is annexed hereto as **Exhibit A**.

13. In the Complaint, Underlying Plaintiff alleges that his injuries were caused by Underlying Defendants' failure to furnish, erect, supply, provide and make available to him, ladders, scaffolds, nets, ropes or other device so constructed, placed and operated as to afford him proper protection for the performance of his work at the Premises.

14. The Complaint asserts Causes of Action for Negligence and Violations of Labor Law §§ 200 *et. seq.*

15. In his Verified Bill of Particulars and Supplemental Verified Bills of Particulars, Plaintiff alleges the incident occurred at approximately 11:30 am, on the second floor of the Premises due to a hazardous opening that was improperly covered and inadequately marked, without proper safety guards, caution signs or other warnings, and alleges the Underlying Defendants were negligent in permitting a dangerous, hazardous and defective condition on the second floor of the Premises, in allowing the floor to become covered with plastic, and in allowing a hazardous opening, among other things.  A true and accurate copy of the Underlying Plaintiff's Verified Bill of Particulars and Supplemental Bills of Particulars are annexed hereto as **Exhibit B.**

16. On or about March 28, 2019, Underlying Defendants, WC 28 and Pizzarotti, filed a Third-Party Complaint against Xtreme Concrete, Inc. ("Xtreme") seeking common law indemnification and/or contribution, contractual indemnification and damages for breach of

contract to procure insurance. A true and accurate copy of the First Third-Party Complaint is annexed hereto as **Exhibit C**.

17. In the First Third-Party Complaint, Third-Party Plaintiffs, WC 28 and Pizzarotti, allege that, prior to January 17, 2017, they entered into a contract and/or agreement with Xtreme for work at the subject premises.

18. Third-Party Plaintiff further allege that the alleged incident that forms the basis of the Underlying Action arose out of the work performed by Xtreme or the work performed by Xtreme's agents, subcontractors, servants and/or employees at the subject premises and that the Underlying Plaintiff's alleged injuries was attributable to the negligence of Xtreme or its subcontractors, agents and/or employees.

19. On or about September 13, 2023, Underlying Defendants, WC 28 and Pizzarotti, filed a Second Third-Party Complaint against Blonder Builders, Inc. ("Blonder") seeking common law and contractual indemnification, contribution and damages for breach of contract to procure insurance. A true and accurate copy of the Second Third-Party Complaint is annexed hereto as **Exhibit D**.

20. In the Second Third-Party Complaint, Third-Party Plaintiffs, WC 28 and Pizzarotti, allege that, prior to January 17, 2017, they entered into a contract with Blonder for certain work and services at the subject premises.

21. Third-Party Plaintiffs further allege Plaintiff's alleged injuries were caused by the wrongful conduct, breach of conduct and negligence of Blonder in that Blonder, its agents, servants, employees and/or subcontractors failed to properly instruct and supervise its employees in the proper method of accomplishing and completing the work agreed to be done in their contract.

22. On or about July 15, 2025, the Court in the Underlying Moore Lawsuit granted the Underlying Plaintiff and Blonder's motions to sever the Second Third-Party Complaint from the main action.

## XTREME SUBCONTRACT

23. Prior to the alleged accident, Pizzarotti, as Construction Manager or "CM", executed an agreement with Xtreme, as Subcontractor, dated April 15, 2016, to perform certain labor and services at the subject premises (the "Xtreme Subcontract"). The Xtreme Subcontract identifies that WC 28, as "Owner", retained Pizzarotti for construction management services for the construction of the project located at the Premises and that Pizzarotti retained Xtreme pursuant thereto.

24. The Xtreme Subcontract contains the following indemnification and insurance provisions:

> **9.** *Indemnification*
>
> **9.1.** *To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold CM, Owner, Owner's lender, Owner's officers, directors, agents and employees, and anyone who might be liable by, through or under any of them, harmless from and against all claims, actions, damages, losses and expenses, however characterized including, but not limited to, reasonable attorney's fees and legal costs, arising in whole or in part out of Subcontractor's act, failure to act, omission, breach or default, including that of its officers, directors, agents, employees, sub-subcontractors and suppliers, in connection with Subcontractor's activities on the Project and/ or under this Agreement. Subcontractor shall strictly comply with all safety and health standards applicable to the Work and/ or the Project as set forth in OSI-IA and this Agreement. J\ny fines levied against Subcontractor as a result of Subcontractor's safety violations will be back-charged directly to Subcontractor.*
>
> **10.** *Insurance*
>
> **10.1.** *Subcontractor shall procure and maintain the insurance required pursuant to the requirements annexed hereto as* **Exhibit E** *until completion of the Work and final payment to Subcontractor. Additionally, individuals and entities making deliveries to the Project shall maintain the insurance required pursuant to the requirements* **Exhibit E.** *Subcontractor shall require all of its sub-subcontractors working to on the Project, if any, to comply with the insurance requirements of* **Exhibit** *E.*

25. Exhibit E to the Xtreme Subcontract includes the following insurance requirements:

*Insurance Requirements*

1. *As a condition of this Agreement, it is agreed that, prior to the commencement of the Work, Subcontractor shall at its sole cost and expense, carry and maintain insurance with a company or companies acceptable to Owner and licensed to do business in the state in which the Project is located with a rating of not less than A VII, as rated in the most currently available "Best's Insurance Guide," providing Subcontractor with the following insurance coverage:*

   *(a)* ***Commercial General Liability Insurance*** *on an occurrence basis with contractual liability with a limit of not less than Two Million Dollars ($2,000,000) for each occurrence and Four Million Dollars ($4,000,000) in the aggregate combined single limit for bodily injury, death and property damage, with cost(s) of defense in addition to limits of liability, and coverage for Owner's and Subcontractor's protective liability to cover Owner's liability arising out of Work performed by Subcontractor and sub-subcontractors at all tiers, pursuant to this Agreement, including:*

   *(i)     Premises and Operations coverage, ,with X, C and U exclusions deleted;*
   *(ii)    Products Liability and Completed Operations coverage (with a separate aggregate limit of not less than Five Million Dollars ($5,000,000));*
   *(iii)   Broad Form Property Damage coverage, including completed operations;*
   *(iv) Blanket Contractual coverage; and*
   *(v) Personal Injury coverage.*

***

3. *With the exception of the Worker's Compensation Insurance referred above, all policies of insurance required under the terms of this Exhibit shall cover Owner, all Additional Insureds as set forth in Exhibit F, and all of their respective partners, members, managers, officers, agents, employees, successors and assignees (and any other individuals or entities as Owner may request) as additional insureds, shall contain a waiver of subrogation in favor of such Additional Insureds and shall have reasonable and customary deductible amounts, provided that in no event shall such deductible amounts exceed $50,000 per occurrence. Cost(s) of defense shall not be included in any of the limits of liability required by this Exhibit. In addition, all policies shall be primary and non-contributing, and shall contain an agreement on the part of the insurers that in the event of cancellation or modification of the policy in whole or in part, or a reduction as to coverage or amount thereunder whether initiated by the insurer or any insured, the insurer shall give not less than thirty (30) days advance written notice to Owner and all Additional Insureds. All such insurance shall be maintained, if available, until the expiration of any applicable statute of limitations, but in any event for a period of not less than six (6) years following completion by Subcontractor of all its Work and obligations under this Agreement.*

26. Exhibit F to the Xtreme Subcontract titled Additional Insured lists the following entities:

*Additional Insured*

*Pizzarotti-IBC, LLC; WC 28 Realty, LLC; Centaur Properties, LLC; RN Realty, LLC; LHB 28, LLC; Greyscale Development Group, LLC; Bank of the Ozarks; The City of New York; SBLM Architects; Westside Realty of New York, Inc.; I.M. Operation, LLC*

27. Exhibit G to the Xtreme Subcontract titled Pizzarotti IBC Hold Harmless Agreement include the following indemnification and insurance provisions:

*INSURANCE*

*Construction Manager will not pay any money to subcontractor unless the subcontractor has previously filed with the Construction Manager, a current Certificate of Liability Insurance in the amount specified for the Worker's Compensation, Employers Liability and Commercial. The policies must name the Construction Manager and the owner as additional insured and show that the subcontractor's liability insurance policy includes Premises Operations, Products/ Completed Operations, Per Project Aggregate, Primary and Non-contributory wording, Contractual Liability. Certificates evidencing these coverage's must be provided prior to commencement of work.*

*\*\*\**

*INDEMNITY*

*To the fullest extent permissible by law he subcontractor agrees to indemnify and hold the Construction Manager, including the Construction Manager's agents and employees, and the Owner, including the Owner's agents and employees, harmless from bodily injury or death to any person and/ or property damage including loss of or arising out of any way relating to the work performed or omission caused by the subcontractor, agents or employees of the subcontractor as well as subcontractor hired by the subcontractor under this contract.*

## **BLONDER SUBCONTRACT**

28. Prior to the alleged accident, Pizzarotti, as Construction Manager, executed an agreement with Blonder, as Subcontractor, dated April 15, 2016, to perform certain labor and services at the subject premises (the "Blonder Subcontract"). The Blonder Subcontract identifies that WC 28, as "Owner", retained Pizzarotti for construction management services for the construction of the project located at the Premises and that Pizzarotti retained Blonder pursuant thereto.

29. The Blonder Subcontract contains the following indemnification and insurance provisions:

**9.    *Indemnification***

**9.1.**   *To the fullest extent permitted by law, Subcontractor shall defend, indemnify and hold CM, Owner, Owner's lender, Owner's officers, directors, agents and employees, and anyone who might be liable by, through or under any of them (the "CM-Owner Parties"), harmless from and against all claims, actions, damages, losses and expenses, however characterized including, but not limited to, reasonable attorney's fees and legal costs (Claims"), arising in whole or in part*

7

> out of Subcontractor's act, failure to act, omission, breach or default, including that of its officers, directors, agents, employees, sub-subcontractors and suppliers, in connection with Subcontractor's activities on the Project and/ or under this Agreement, except to the extent caused by the negligence or intentional acts of the CM-Owner Parties. Subcontractor shall strictly comply with **all** safety and health standards applicable to the Work and/or the Project as set forth in OSHA and this Agreement, except to the extent caused by the negligence or intentional acts of the CM-Owner Parties. Any fines levied against Subcontractor as a result of Subcontractor's safety violations will be back-charged directly to Subcontractor.
>
> **9.2.** To the fullest extent permitted by law, the CM shall defend, indemnify and hold Subcontractor's officers, directors, agents and employees, and anyone who might be liable by, through or under any of them (the "Subcontractor Parties"), harmless from and against all claims, actions, damages, losses and expenses, however characterized including, but not limited to, reasonable attorney's fees and legal costs, arising in whole or in part out of CM's act, failure to act, omission, breach or default, including that of its officers, directors, agents, employees, sub-subcontractors and suppliers, in connection with CM's activities on the Project and/or under this Agreement.
>
> **10.** *Insurance*
>
> **10.1.** Subcontractor shall procure and maintain the insurance required pursuant to the requirements annexed hereto as **Exhibit E** until completion of the Work and final payment to Subcontractor. Additionally, individuals and entities making deliveries to the Project shall maintain the insurance required pursuant to the requirements **Exhibit E.** Subcontractor shall require all of its sub-subcontractors working to on the Project, if any, to comply with the insurance requirements of **Exhibit E.**

30.     Exhibit E to the Blonder Subcontract includes the following insurance requirements:

*<u>Insurance Requirements</u>*

*1.      As a condition of this Agreement, it is agreed that, prior to the commencement of the Work, Subcontractor shall at its sole cost and expense, carry and maintain insurance with a company or companies acceptable to Owner and licensed to do business in the state in which the Project is located with a rating of not less than A VII, as rated in the most currently available "Best's Insurance Guide," providing Subcontractor with the following insurance coverage:*

*(a)      **Commercial General Liability Insurance** on an occurrence basis with contractual liability with a limit of not less than Two Million Dollars ($2,000,000) for each occurrence and Four Million Dollars ($4,000,000) in the aggregate combined single limit for bodily injury, death and property damage, with cost(s) of defense in addition to limits of liability, and coverage for Owner's and Subcontractor's protective liability to cover Owner's liability arising out of Work performed by Subcontractor and sub-subcontractors at all tiers pursuant to this Agreement, including:*

*(i)      Premises and Operations coverage, with X, C and U exclusions deleted;*

8

> (ii)  Products Liability and Completed Operations coverage (with a separate aggregate limit of not less than Five Million Dollars ($5,000,000));
> (iii) Broad Form Property Damage coverage, including completed operations;
> (iv)  Blanket Contractual coverage; and
> (v)   Personal Injury coverage.
>
> ***
>
> **3.** With the exception of the Worker's Compensation Insurance referred above, all policies of insurance rec1uired under the terms of this Exhibit shall cover Owner, all Additional Insureds as set forth in *Exhibit F*, and all of their respective partners, members, managers, officers, agents, employees, successors and assignees (and any other individuals or entities as Owner may request) as additional insureds, shall contain a waiver of subrogation in favor of such Additional Insureds and shall have reasonable and customary deductible amounts, provided that in no event shall such deductible amounts exceed $50,000 per occurrence. Cost(s) of defense shall not be included in any of the limits of liability required by this Exhibit. In addition, all policies shall be primary and non-contributing, and shall contain an agreement on the part of the insurers that in the event of cancellation or modification of the policy in whole or in part, or a reduction as to coverage or amount thereunder whether initiated by the insurer or any insured, the insurer shall give not less than thirty (30) days advance written notice to Owner and all Additional Insureds. All such insurance shall be maintained, if available, until the expiration of any applicable statute of limitations, but in any event for a period of not less than six (6) years following completion by Subcontractor of all its Work and obligations under this Agreement.

31. Exhibit F to the Blonder Subcontract titled Additional Insured lists the following entities:

> **Additional Insured**
>
> *Pizzarotti-IBC, LLC; WC 28 Realty, LLC; Centaur Properties, LLC; RN Realty, LLC; LHB 28, LLC; Greyscale Development Group, LLC; Bank of the Ozarks; The City of New York; SBLM Architects; Westside Realty of New York, Inc.; I.M. Operation, LLC*

32. Exhibit G to the Blonder Subcontract titled Pizzarotti IBC Hold Harmless Agreement include the following indemnification and insurance provisions:

> *INSURANCE*
>
> *Construction Manager will not pay any money to subcontractor unless the subcontractor has previously filed with the Construction Manager, a current Certificate of Liability Insurance in the amount specified for the Worker's Compensation, Employers Liability and Commercial. The policies must name the Construction Manager and the owner as additional insured and show that the subcontractor's liability insurance policy includes Premises Operations, Products/Completed Operations, Per Project Aggregate, Primary and Non-contributory wording, Contractual Liability. Certificates evidencing these coverage's must be provided prior to commencement of work.*
>
> ***

*INDEMNINITY*

*To the fullest extent permissible by law he subcontractor agrees to indemnify and hold the Construction Manager, including the Construction Manager's agents and employees, and the Owner, including the Owner's agents and employees, harmless from bodily injury or death to any person and/ or property damage including loss of or arising out of any way relating to the work performed or omission caused by the subcontractor, agents or employees of the subcontractor as well as subcontractor hired by the subcontractor under this contract, unless and to the extent caused by the negligence or intentional acts of the CM, its agents or employees.*

## SNIC POLICY

33. SNIC issued Policy No. PSS 2101391 to WC 28 Realty, LLC, LHB 28, LLC, Pav-Lack Contracting, Inc. for the policy period of June 23, 2014 to June 23, 2017 (Or until end of project, whichever comes first) (the "SNIC Policy").

34. The SNIC Policy contains Endorsement No. 37 titled Amendment – Named Insured, effective August 4, 2015, amending the Named Insureds under the Policy to include Pizzarotti IBC LLC.

35. SNIC has been providing a defense to WC 28 and Pizzarotti in the Underlying Moore Lawsuit.

## SCOTTSDALE POLICY

36. Scottsdale issued Commercial General Liability Insurance Policy No. NCS0000648 to X-Treme Concrete Inc., effective June 1, 2015, with limits of $1 million per occurrence and $2 million in the aggregate, and $2 million for Products/Completed Operations aggregate (the "Scottsdale Policy").

37. Upon information and belief, the Scottsdale Policy contains an Additional Insured – Owners, Lessees or Contractors – Automatic Status When Required in Construction Agreement With You endorsement.

38. Upon information and belief, the Scottsdale Policy also contains an Additional Insured – Owners, Lessees or Contractors – Completed Operations endorsement.

**JAMES RIVER POLICY**

39.     James River issued Commercial General Liability Insurance Policy No. 000070213-0 to Blonder Builders Inc. with the policy period of February 8, 2016 to February 8, 2017, with limits of $1 million per occurrence, $2 million in the aggregate, and $2 million for Products/Completed Operations aggregate (the "James River Policy").

**TENDERS TO SCOTTSDALE**

40.     On or about July 8, 2018, Wood Smith Henning Berman ("WSHB"), defense counsel for WC 28 and Pizzarotti sent a letter to Xtreme seeking defense and indemnification for WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

41.     On or about July 11, 2018, WSHB sent a letter to Scottsdale, Xtreme's insurer, seeking defense, indemnification and additional insured coverage for WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

42.     On or about September 7, 2018, Xtreme's insurer issued a letter denying the tender for defense, indemnification and additional insured coverage for WC 28 and Pizzarotti for the Underlying Moore Lawsuit on the basis that there is no evidence that the loss was caused, in whole or in part, by the named insured's work and/or operations.

43.     On or about September 9, 2021, WSHB sent a renewed tender to Scottsdale again seeking defense, indemnification and additional insured coverage for WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

44.     By letter dated October 8, 2021, Scottsdale reiterated its denial of defense, indemnification and additional insured coverage for WC 28 and Pizzarotti for the Underlying Moore Lawsuit on the basis that there is no evidence to establish that the loss arises from its insured's work/operations.

**TENDER TO JAMES RIVER**

45. By letters dated March 27, 2019, April 18, 2019, April 22, 2019 and September 6, 2023, WSHB wrote to Blonder seeking defense, indemnification and additional insured coverage for WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

46. On or about September 21, 2023, WSHB sent a letter to James River, Blonder's insurer, seeking defense, indemnification and additional insured coverage for WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

47. To date, James River has not responded to the tender for coverage for WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

## COUNT I
### Declaration by the Court that Scottsdale owes Defense Coverage to WC 28 and Pizzarotti

48. Plaintiff repeats, re-alleges, and restates each and every allegation contained in paragraphs "1" through "47", inclusive, with the same force and effect as if fully set forth herein.

49. WC 28 and Pizzarotti qualify as additional insureds on the Scottsdale Policy.

50. The allegations of the Underlying Moore Lawsuit and the associated First Third-Party Complaint against Xtreme are of liability caused, in whole or in part, by Xtreme's ongoing or completed operations for WC 28 and Pizzarotti as required for coverage.

51. Therefore, Scottsdale owes defense coverage to WC 28 and Pizzarotti for the claims pled against them in the Underlying Moore Lawsuit.

52. SNIC's coverage for WC 28 and Pizzarotti is excess to Scottsdale, which owes coverage to WC 28 and Pizzarotti on a primary and noncontributory basis.

53. Accordingly, Plaintiff is entitled to a declaration that Scottsdale is obligated to provide defense coverage to WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

## COUNT II
### Reimbursement of Defense Fees and Costs Against Scottsdale

54. Plaintiff repeats, re-alleges, and restates each and every allegation contained in paragraphs "1" through "53", inclusive, with the same force and effect as if fully set forth herein.

55. SNIC has been making payment of fees and costs for WC 28 and Pizzarotti's defense in an amount to be determined.

56. Scottsdale's failure to make payment of WC 28 and Pizzarotti's defense fees and costs is in breach of its obligations under the Scottsdale Policy.

57. SNIC has been damaged by Scottsdale's breach.

58. Scottsdale is obligated to pay/reimburse SNIC for the past and continuing defense fees and costs incurred on behalf of WC 28 and Pizzarotti to date in an amount to be determined, plus interest.

## COUNT III
### Declaration by the Court that Scottsdale owes Indemnity Coverage to WC 28 and Pizzarotti

59. Plaintiff repeats, re-alleges, and restates each and every allegation contained in paragraphs "1" through "58", inclusive, with the same force and effect as if fully set forth herein.

60. The facts disclosed in the Underlying Moore Lawsuit and the associated First Third-Party Complaint against Xtreme indicate that the Underlying Plaintiff Moore was injured due to Xtreme's negligence in the performance of its work.

61. The facts of the Underlying Moore Lawsuit indicate that Underlying Plaintiff Moore's injuries were caused, in whole or in part, by Xtreme's ongoing or completed operations for WC 28 and Pizzarotti as required for coverage.

62. Plaintiff is entitled to a declaration that Scottsdale is obligated to provide indemnity coverage to WC 28 and Pizzarotti for any recovery by the Underlying Plaintiff Moore against them in the Underlying Moore Lawsuit.

63. Plaintiff is further entitled to a declaration that SNIC owes indemnity coverage on an excess basis and Scottsdale on a primary and noncontributory basis and hence, that Scottsdale must make payment of any judgment or settlement of the claims pled against WC 28 and Pizzarotti in the Underlying Moore Lawsuit before SNIC has any obligations to make any indemnity payments.

### COUNT IV
### Declaration by the Court that James River owes Defense Coverage to WC 28 and Pizzarotti

64. Plaintiff repeats, re-alleges, and restates each and every allegation contained in paragraphs "1" through "63", inclusive, with the same force and effect as if fully set forth herein.

65. WC 28 and Pizzarotti qualify as additional insureds on the James River Policy.

66. The allegations of the Underlying Moore Lawsuit and the associated Second Third-Party Complaint against Blonder are of liability caused, in whole or in part, by Blonder's acts or omissions or the acts or omissions of those acting on Blonder's behalf as required for coverage.

67. Therefore, James River owes defense coverage to WC 28 and Pizzarotti for the claims pled against them in the Underlying Moore Lawsuit.

68. SNIC's coverage for WC 28 and Pizzarotti is excess to James River, which owes coverage to WC 28 and Pizzarotti on a primary and noncontributory basis.

69. Accordingly, Plaintiff is entitled to a declaration that James River is obligated to provide defense coverage to WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

### COUNT V
### Reimbursement of Defense Fees and Costs Against James River

14

70. Plaintiff repeats, re-alleges, and restates each and every allegation contained in paragraphs "1" through "69", inclusive, with the same force and effect as if fully set forth herein.

71. SNIC has been making payment of fees and costs for WC 28 and Pizzarotti's defense in an amount to be determined.

72. James River's failure to make payment of WC 28 and Pizzarotti's defense fees and costs is in breach of its obligations under the James River Policy.

73. SNIC has been damaged by James River's breach.

74. James River is obligated to pay/reimburse SNIC for the past and continuing defense fees and costs incurred on behalf of WC 28 and Pizzarotti to date in an amount to be determined, plus interest.

**COUNT VI**
**Declaration by the Court that James River owes Indemnity Coverage**
**to WC 28 and Pizzarotti**

75. Plaintiff repeats, re-alleges, and restates each and every allegation contained in paragraphs "1" through "74", inclusive, with the same force and effect as if fully set forth herein.

76. The facts disclosed in the Underlying Moore Lawsuit and the associated Second Third-Party Complaint against Blonder indicate that the Underlying Plaintiff Moore was injured due to Blonder's negligence in the performance of its work.

77. The facts of the Underlying Moore Lawsuit indicate that Underlying Plaintiff Moore's injuries were caused, in whole or in part, by Blonder's acts or omissions or the acts or omissions of those acting on Blonder's behalf as required for coverage.

78. Plaintiff is entitled to a declaration that James River is obligated to provide indemnity coverage to WC 28 and Pizzarotti for any recovery by the Underlying Plaintiff Moore against them in the Underlying Moore Lawsuit.

79. Plaintiff is further entitled to a declaration that SNIC owes indemnity coverage on an excess basis and James River on a primary and noncontributory basis and hence, that James River must make payment of any judgment or settlement of the claims pled against WC 28 and Pizzarotti in the Underlying Moore Lawsuit before SNIC has any obligations to make any indemnity payments.

WHEREFORE, Plaintiff seeks the following relief against Defendants:

(1) On Count I, a declaration that Scottsdale has an obligation to provide defense coverage to WC 28 and Pizzarotti for all of the claims pled against them in the Underlying Moore Lawsuit.

(2) On Count II, an award against Scottsdale for recovery of all defense fees and costs incurred and paid on behalf of WC 28 and Pizzarotti to date.

(3) On Count III, a declaration that Scottsdale has an obligation to provide indemnity coverage to WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

(4) On Counts I and III, a declaration that SNIC's coverage obligations WC 28 and Pizzarotti are excess to Scottsdale, which owes coverage on a primary and noncontributory basis.

(5) On Count IV, a declaration that James River has an obligation to provide defense coverage to WC 28 and Pizzarotti for all of the claims pled against them in the Underlying Moore Lawsuit.

(6) On Count V, an award against James River for recovery of all defense fees and costs incurred and paid on behalf of WC 28 and Pizzarotti to date.

(7) On Count VI, a declaration that James River has an obligation to provide indemnity coverage to WC 28 and Pizzarotti for the Underlying Moore Lawsuit.

(8) On Counts IV and VI, a declaration that SNIC's coverage obligations WC 28 and Pizzarotti are excess to James River, which owes coverage on a primary and noncontributory basis.

(9) Such other relief as the Court deems just and equitable.

Dated: New York, NY
       April 28, 2025                    FLEISCHNER POTASH LLP

By: *[signature: Jennifer Mindlin]*

        Jennifer F. Mindlin, Esq.
*Attorneys for Plaintiff,*
*State National Insurance Company*
45 Broadway, 23rd Floor
New York, NY 10006
T: (646) 520-4200
Email: JMindlin@fp.law
File No.: 706-24771